IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00462-WYD-NYW

JUSTIN SMITH, et al.

  Plaintiffs,

v.

JOHN W. HICKENLOOPER, in his official capacity as Governor of the State of Colorado,

  Defendant.

---

### Defendant's Motion to Dismiss Plaintiffs' Complaint Under Rules 12(b)(1) and 12(b)(6)

---

Defendant, John W. Hickenlooper, Jr., in his official capacity as Governor of the State of Colorado, respectfully requests that the Court dismiss Plaintiffs' Complaint and enter final judgment in his favor.

### INTRODUCTION, PROCEDURAL HISTORY, AND FACTS

Colorado's voters adopted Amendment 64 in 2012, adding Article XVIII, Section 16 to the Colorado Constitution.  Plaintiffs argue that three provisions of Amendment 64—section 3 (governing the personal use of recreational marijuana), section 4 (governing recreational marijuana facilities), and section 5 (providing for the regulation of recreational marijuana)—are invalid because they conflict with federal law and international treaties and therefore violate the Supremacy Clause.  Plaintiffs seek to enjoin implementation and application of those constitutional provisions.

Plaintiffs' theory is that through the Controlled Substances Act (the "CSA"), 21 U.S.C. §§ 801 *et seq*., and various International Conventions,[1] Congress intended to prevent the states from adopting marijuana-related laws that do not adhere to a policy of marijuana prohibition. Arguing that Congress has "preeminent federal authority and responsibility over controlled substances," Plaintiffs allege that permitting states to regulate marijuana, rather than independently criminalizing it, will create a "patchwork" that "interferes with the federal drug laws."  ECF #1, ¶¶ 3, 4.  Plaintiffs do not argue that the CSA or the International Conventions "occupy the field" of marijuana regulation in the sense that state *criminal* laws on the topic must be preempted; they instead argue that any law, rule, or regulation that is not directly in concert with a policy of complete criminalization is void.

Plaintiffs fall into three groups:

- Sheriffs from Colorado (Smith, Day, Heap, Bruce, Sheridan, and McKee), who appear only in their individual capacities (the "Colorado Sheriffs");

- Sheriffs from counties in other states (Hayward, Jenson and Overman from Nebraska, and Pianalto from Kansas), who appear in their individual and official capacities (collectively, the "Foreign Sheriffs," or, as appropriate, the "Nebraska Sheriffs" or "Kansas Sheriff"); and

- County Attorneys Moser (the "Kansas Attorney") and Schaub (the "Nebraska Attorney"), both of whom sue the Governor in their individual and official capacities.

ECF #1, ¶¶ 8–19.

---

[1] Plaintiffs argue that Amendment 64 contravenes the Single Convention on Narcotic Drugs of 1961 (the Single Convention), the Convention on Psychotropic Substances of 1971 (the "1971 Convention") and the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances of 1988 (the "1988 Convention").  ECF #1, ¶ 41.  These conventions are collectively referred to as the "International Conventions."

Plaintiffs assert two overlapping causes of action.  First, they assert that Colorado's adoption of laws and regulations to effectuate Amendment 64 conflicts with and impedes the execution of the CSA, American foreign policy and related treaties, and Congressional intent. ECF #1, ¶¶ 104–06.  Next, Plaintiffs allege that Sections 16(3)–(5) of Amendment 64 are preempted by the CSA and American foreign policy.  ECF #1, ¶¶ 107–08. Plaintiffs seek a declaration that Sections 16(3)–(5) are unconstitutional and an injunction barring their enforcement.  They do not seek damages.

## STANDARD OF REVIEW

**Fed. R. Civ. P. 12(b)(1).**  Dismissal under Federal Rule of Civil Procedure 12(b)(1) is not a judgment on the merits, but is instead a determination that the court lacks authority to adjudicate the matter.  *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994).  If a court lacks jurisdiction, it "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  Such motions are "determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  Plaintiffs bear the burden of establishing subject matter jurisdiction. *Basso*, 495 F.2d at 909.

**Fed. R. Civ. P. 12(b)(6).**  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).  Plausibility, in the context of a motion to dismiss, means that the

plaintiff pleads facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A Rule 12(b)(6) evaluation proceeds in two parts.  First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth"—those that are legal conclusions or bare assertions, or are merely conclusory.  *Id*. at 680.  Second, the Court reviews the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

## ARGUMENT

The Court should dismiss this case for three reasons.  First, Plaintiffs lack standing.  Second, Plaintiffs fail to state a cause of action because the CSA, the Supremacy Clause, and the International Conventions neither include nor create a right of private enforcement.  Finally, Plaintiffs' claims fail as a matter of law on the merits.

## I.   Plaintiffs lack standing to sue the Governor, whether in their official or individual capacities.

To establish standing, each Plaintiff must prove (1) he has suffered an injury-in-fact to a legally protected interest that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) it is likely, rather than speculative, that the injury will be redressed by a favorable decision.  *Bronson v. Swensen*, 500 F.3d 1099, 1106, 1109 (10th Cir. 2007).

Each Plaintiff fails this test.  The Colorado Sheriffs—who ostensibly assert only individual capacity claims—cannot demonstrate an injury-in-fact, and to the extent they assert

that Amendment 64 interferes with their official duties, their claims are barred by the political

subdivision doctrine.  The Foreign Sheriffs and Kansas and Nebraska Attorneys, meanwhile,

lack standing because they do not meet the causation and redressability requirements for Article

III standing.

A.     **The Colorado Sheriffs.**

1.     *The political subdivision doctrine applies to the Colorado Sheriffs
       despite their attempt to evade it.*

The political subdivision doctrine—which holds that federal courts lack jurisdiction over

controversies between political subdivisions and their parent states—bars the Colorado Sheriffs

from challenging Amendment 64 by bringing an official capacity lawsuit.  *See City of Hugo v.

Nichols*, 656 F.3d 1251, 1255–58 (10th Cir. 2011); *see also Cooke v. Hickenlooper*, No. 13-cv-

01300-MSK-MJW, 2013 U.S. Dist. LEXIS 168806, at *30-42 (D. Colo. Nov. 27, 2013)

(applying the political subdivision doctrine to bar a group of Colorado Sheriffs from challenging

Colorado law in their official capacities).  The Colorado Sheriffs tacitly acknowledge this

limitation—and seek to evade it—by alleging only individual capacity claims.  But despite

masquerading as individual capacity plaintiffs, the harm alleged by the Colorado Sheriffs relies

solely upon, and relates solely to, their status as public officials.  Because they allege no harm to

themselves in their individual capacities, the Colorado Sheriffs fail to satisfy any of the

requirements for standing under Article III.

The Colorado Sheriffs allege that Amendment 64 harms them in two ways.  First, they

assert it forces them to violate their oath of office, under which they swear to uphold both the

United States and Colorado Constitutions.  ECF #1, ¶ 74.  The Colorado Sheriffs maintain that

"these oaths contradict each other" due to Amendment 64, and that each of them "is required to

violate one of these oaths in performing his duties relating to conflicting federal and Colorado

marijuana laws." *Id.*  Second, they allege that they "encounter marijuana while performing their duties," *id*. at ¶ 76, and that "[b]y seizing or initially taking possession of marijuana they encounter and returning it to someone who possesses it illegally under the CSA, the Colorado Sheriffs believe they personally are violating the CSA by illegally distributing a controlled substance." *Id.* at ¶ 79.

At the threshold, both of these claims are plainly "individual capacity" in name only, as they arise solely out of the Colorado Sheriffs' official duties as sworn officers and relate only to the execution of those official duties.  Setting aside the fact that the Colorado Sheriffs are not independently authorized to enforce the CSA, *see* 21 U.S.C. § 878(a) (empowering State and local law enforcement officers to enforce the CSA only if "designated" by the United States Attorney General), their complaint concedes that their "encounters" with marijuana arise as a part of their "day-to-day *duties.*"  *Id.* at ¶ 76 (emphasis added).  On the other hand, Colorado Sheriffs make no allegation that Amendment 64 adversely affects them outside their law enforcement roles.  Because Colorado Sheriffs allege no individual capacity harm, and because they cannot assert an official capacity claim, they have no injury-in-fact from which Article III standing may be derived.

**2.      *The Colorado Sheriffs have not suffered a cognizable injury in fact.***

Even assuming the Colorado Sheriffs can avoid the political subdivision doctrine, both of their claims of injury are legally insufficient and foreclosed by case law and the CSA itself.

*First*, courts have consistently rejected the notion that a law enforcement officer's concern about violating his oath can give rise to an injury-in-fact.  *See, e.g., Crane v. Johnson*, No. 14-10049, 2015 U.S. App. LEXIS 5573 at *20 (5th Cir. April 7, 2015) (holding that "a violation of one's oath alone is insufficient injury to support standing"); *S. Lake Tahoe v. Cal.*

*Tahoe Reg'l Planning Agency*, 625 F.2d 231, 236–37 (9th Cir. 1980) (same); *Cooke,* 2013 U.S. Dist. LEXIS 168806, at *36–41 (same).

 ***Second***, an injury-in-fact does not arise by "[t]he mere presence on the statute books of an [allegedly] unconstitutional statute . . . even if [Plaintiffs] allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). Thus, an assertion that compliance with Amendment 64 exposes the Colorado Sheriffs to personal criminal liability under the CSA requires a showing that they face a "credible threat" of prosecution for engaging in the activities they describe. If the Colorado Sheriffs fail to establish that they have "ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Nat'l Counsel for Imp. Health v. Shalala*, 122 F.3d 878, 884 (10th Cir. 1997) (quoting *Babbit v. United Farm Worker's Nat'l Union*, 442 U.S. 289, 298–99 (1979)).

 The CSA states that no civil or criminal liability can be imposed on a State-level law officer who is "lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances." *See* 21 U.S.C. § 885(d). State courts in Colorado and elsewhere have regularly relied upon this provision to reject claims similar to those asserted by Colorado Sheriffs here. In *People v. Crouse*, __P.3d__, 2013 COA 174 (Colo. App. 2013), for example, a Colorado district court had directed a police department to return seized marijuana plants taken from a medical marijuana patient's home. The police department appealed, asserting in part that "police officers' returning marijuana to a patient would violate the CSA." *Id.* at ¶ 8. Colorado's Court of Appeals affirmed, holding that 21 U.S.C. § 885(d) "'carves out a specific exemption for distribution of controlled substances by law enforcement officers.'" *Id.* at ¶ 28 (quoting *United*

*States v. Cortes-Caban*, 691 F.3d 1, 20 (1st Cir. 2012)).  This holding was consistent with every

other state court that has addressed the question Colorado Sheriffs raise here.[2]

Even if the exemption in § 885(d) of the CSA were not by itself enough to eliminate a

"credible threat" of prosecution, Colorado Sheriffs' argument would still fail:  the federal

government has affirmatively stated it will not enforce the CSA against individuals such as the

Colorado Sheriffs.  In 2013, the United States Deputy Attorney General issued a memorandum

(known as the "Cole Memo") setting forth a policy of marijuana non-enforcement in states that

have "implemented strong and effective regulatory and enforcement systems."  James M. Cole,

Memorandum for U.S. Att'ys, Guidance Regarding Marijuana Enforcement at 3 (August 29,

2013), available at http://tinyurl.com/nrc9ur8.  The identified "regulatory and enforcement

systems" expressly include "enforcement of state law by state and local law enforcement and

regulatory bodies [as] the primary means of addressing marijuana-related activity."  *Id.*

The Cole Memo's acknowledgment of local law enforcement's role in regulating

marijuana at the state level establishes that there is no "credible threat" that the Colorado Sheriffs

could be federally prosecuted for acting in accordance with state law.  *Bronson* 500 F.3d at 1109.

In *Bronson*, plaintiffs' alleged fear of prosecution was "belied by the policy statement of the

Utah Attorney General's Office that it has decided to focus law enforcement efforts" elsewhere.

*Id.*  Similarly, plaintiffs have been found to lack standing when a county prosecutor issued an

---

[2] *See, e.g., State v. Okun*, 296 P.3d 998, 1002 (Ariz. Ct. App. 2013) (holding that § 885(d) "immunizes law enforcement officers such as the Sheriff from any would-be federal prosecution for complying with a court order to return Okun's marijuana to her"); *City of Garden Grove v. Sup. Ct.*, 68 Cal. Rptr. 3d, 656, 678 (Cal. Ct. App. 2007) (holding that CSA's prohibition on distribution "does not apply to persons who regularly handle controlled substances in the course of their professional duties"); *State v. Kama*, 39 P.3d 866, 868 (Or. Ct. App. 2002) (same).

affidavit in which he stated it was "doubtful that Utah County would bring" charges against the plaintiff,  *D.L.S. v. Utah*, 374 F.3d 971, 974 (10th Cir. 2004); when a district attorney authored a "No File" letter disavowing intent to prosecute under a criminal libel statute*, Mink v. Suthers*, 482 F.3d 1244, 1253–55 (10th Cir. 2007); and when a state Attorney General issued interpretive guidance designed to clarify questions about the coverage of a criminal statute.  *Cooke,* 2013 U.S. Dist. LEXIS 168806, at *18–21.  Because they face no credible threat of CSA liability, Colorado Sheriffs cannot base their standing on this theory.

**3.   *The Colorado Sheriffs' claims fail to allege traceability and redressability.***

Even if the Colorado Sheriffs' alleged injuries were legally sufficient, they still cannot establish that those injuries are traceable to Amendment 64 or that the relief they seek would redress those injuries.  Colorado legalized medical marijuana more than ten years before Amendment 64 passed, and adopted laws to license and regulate medical marijuana businesses in 2010.  *See* COLO. CONST. art. XVIII, § 14 ("Amendment 20") (providing for the medical use of marijuana), and COLO. REV. STAT. §§ 12-43.3-101 through 110 (the "Medical Marijuana Code"). Medical marijuana currently accounts for over half of Colorado's marijuana industry.  *See* Colo. Dep't of Revenue, Marijuana Enforcement Div., Annual Update at 3 (Feb. 27, 2015), http://tinyurl.com/prskdn6.  Even if the Colorado Sheriffs succeed in invalidating Sections 16(3)–(5) of Amendment 64, this would leave intact all of Amendment 20, COLO. CONST. art. XVIII, § 14 (providing for the medical use of marijuana), and the entire Medical Marijuana Code, COLO. REV. STAT. §§ 12-43.3-101 through 110.  Thus, even if they prevail, the Colorado Sheriffs will continue to experience their alleged injuries—they will continue to encounter medical marijuana as part of their public duties, and they will remain responsible for enforcing Colorado medical marijuana laws despite the CSA.

**B.      The remaining Plaintiffs lack Article III standing.**

        **1.      *The harms alleged by the non-Colorado Plaintiffs are not traceable to Defendant.***

The official capacity harms alleged by non-Colorado Plaintiffs primarily arise from their claim that they have diverted resources to address cross-border marijuana trafficking allegedly caused by Amendment 64.[3]  The Foreign Sheriffs allege that "they encounter[ ] marijuana on a regular basis" during "routine stops."  ECF #1. ¶ 85.  They aver that when they "inspect the marijuana or question the individuals," they "frequently learn" that it was purchased in Colorado. *Id.*  This "significant influx," *id.* ¶ 86, the Foreign Sheriffs contend, has forced them to divert resources "to counteract the increased trafficking and transportation of Colorado-sourced marijuana," and to handle the various ancillary costs associated with "increased level[s] of incarceration of suspected and convicted felons on charges related to Colorado-sourced marijuana," *id.* ¶ 88–89.  Among other things, the Foreign Sheriffs claim that they have "been forced . . . to scale back on drug education and awareness programs in schools" due to the costs associated with their "Amendment 64-related interdiction efforts."  *Id.* ¶ 90.  The Kansas and Nebraska Attorneys make similar allegations, claiming that an increase in arrests for marijuana trafficking has led to an increase in caseloads, *id.* ¶ 97, and that as a result, they have been "unable to fully implement their prosecutorial priorities as they had existed and had been budgeted prior to the adoption of Colorado Amendment 64."  *Id.* ¶ 100.

Assuming *arguendo* these asserted harms amount to an injury-in-fact under Article III, the non-Colorado Plaintiffs are unable to show that either they are traceable to the Defendant or

---

[3] The official capacity harms asserted by the non-Colorado Plaintiffs are not barred because they are not political subdivisions of Colorado.  *City of Hugo*, 656 F.3d at 1263.

would be redressed by the relief that they seek. "To invoke federal jurisdiction, a plaintiff must show that his or her injury is 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). When a third party is the source of an alleged injury, causation "hinge[s] on the response of [that] regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562; *see also Allen v. Wright*, 468 U.S. 737, 758 (1984).

The non-Colorado Plaintiffs cannot show that any alleged harm associated with Amendment 64 is traceable to Colorado's Governor, the named Defendant in this case. There is no allegation that the Governor himself, or indeed any state actor, engages in the cross-border diversion of marijuana. Instead, the cross-border trafficking that allegedly harms the non-Colorado Plaintiffs is carried out by "third part[ies] not before the court," *Nova Health Sys.*, 406 F.3d at 1156—individuals who choose to violate federal and state law by taking marijuana across state lines. ECF #1, ¶ 85.

Further complicating this causal chain is, in *Lujan*'s words, "the response of others"—namely, the actions of the Department of Justice, the entity responsible for enforcing the CSA, and the practices of Colorado's own law enforcement related to illegal marijuana. For example, the Justice Department intends to continue to "[p]revent[ ] the diversion of marijuana from states where it is legal . . . to other states." Cole Memo at 1. Thus, here, the third parties that are allegedly injuring the non-Colorado Plaintiffs are not only violating the CSA but are doing so in a way that falls outside the scope of the Cole Memo's framework. Additionally, these third parties are violating the laws of Nebraska and Kansas and (in cases of unregulated distribution of marijuana and possession of sizable amounts of marijuana) the laws of Colorado as well. *See*,

*e.g.*, Amendment 64, § 16(3) (listing acts that are not unlawful "under Colorado law or the law of any locality within Colorado"); COLO. REV. STAT. § 18-18-309 (2014) (diversion prevention and control). Indeed, Colorado continues to prosecute out-of-state marijuana trafficking. *People v. Nguyen*, Grand Jury Case No. 14CR01, Indictment (Denver Dist. Ct. Mar. 20, 2015) (indicting 37 defendants for a scheme to operate a marijuana distribution ring from Colorado to Minnesota).

The non-Colorado Plaintiffs may believe that current enforcement efforts are unsatisfactory, but they have no legally cognizable interest in the manner in which the federal government, or Colorado, carries out its law enforcement functions. See, e.g., *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."). Ultimately, the causal chain, which depends on both the unlawful behavior of private individuals and the law enforcement policies of multiple governments, is too attenuated in this case to satisfy Article III standing requirements.

### 2.   *Abolishing Colorado's regulatory scheme will not redress the injury alleged by the non-Colorado Plaintiffs.*

Plaintiffs do not restrict their challenge to Colorado's regulatory scheme for marijuana cultivation and distribution. By requesting invalidation of § 16(3) of Amendment 64—which authorizes personal use, cultivation, and small-scale transfers without remuneration—Plaintiffs effectively contend that this Court should order Colorado to recriminalize marijuana. But invalidating Amendment 64 would leave Colorado's medical marijuana laws intact—and this would still leave open the possibility that third parties would choose to break the law by bringing Colorado marijuana across state lines. See *Gonzales v. Raich*, 545 U.S. 1, 31–32 (2005) (noting that medical marijuana, even if personally cultivated by patients and caregivers, is vulnerable to

diversion).  And ordering Colorado to criminalize marijuana would violate the Tenth

Amendment.  *New York v. United States*, 505 U.S. 144, 188 (1992) ("Whatever the outer limits

of [State] sovereignty may be, one thing is clear: The Federal Government may not compel the

States to enact or administer a federal regulatory program.").  Because this Court cannot grant

the relief that Plaintiffs ultimately seek, their claim is not redressable through this lawsuit.

Plaintiffs' Complaint should thus be dismissed for lack of Article III standing.

II.	**Plaintiffs have no cause of action under the CSA, the International Conventions, or the Supremacy Clause.**

Plaintiffs seek to invalidate Colorado's statewide regulatory system for retail marijuana

by invoking the CSA, the International Conventions, and the Supremacy Clause.  ECF #1, ¶¶

105–108.  A threshold question is whether Plaintiffs have the right to enforce those provisions

through this lawsuit.  As set forth below, no such rights exist, and Plaintiffs' lawsuit must be

dismissed for failure to state a claim.

A.	**There is no private right of action to enforce the CSA.**

"[P]rivate rights of action to enforce federal law must be created by Congress. . . .

Without [statutory intent to create a private cause of action], a cause of action does not exist and

courts may not create one, no matter how desirable that might be as a policy matter, or how

compatible with the statute."  *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (internal

citations omitted).  To create a private cause of action, a federal statute must be "phrased in [ ]

explicit rights-creating terms."  *Gonzaga v. Doe*, 536 U.S. 273, 284 (2002); *see also Cuba Soil &*

*Water Conservation Dist. v. Lewis*, 527 F.3d 1061, 1064 (10th Cir. 2008).

13

The federal courts have uniformly held that the CSA does not—either expressly or impliedly—create a private right of action.[4]   To the contrary, according to its plain terms, "[t]he [CSA] is a statute enforceable only by the Attorney General and, by delegation, the Department of Justice." *Schneller v. Crozer Chester Med. Ctr.*, 387 Fed. App'x 289, 293 (3d Cir. 2010) (citing 21 U.S.C. § 871(a)); *see also Shmatko v. Ariz. CVS Stores LLC*, No. 14-CV-01076, 2014 U.S. Dist. LEXIS 105447, at *5–6 (D. Ariz. Aug. 1, 2014).   Specifically, the Attorney General may enforce the substantive provisions of the CSA by way of criminal (21 U.S.C. §§ 841–51), civil (*id*. § 881), or administrative proceedings (*id*. § 875).   Only in limited circumstances does the CSA grant other parties enforcement powers—and these powers never apply to private litigants.   *Id*. § 878(a) (empowering the Attorney General to "designate[ ]" State and local law enforcement officers to enforce the CSA); *id*. § 882(c) (granting States limited authority to enforce the CSA against online pharmacies, but expressly noting that "[n]o private right of action is created under this subsection").

Because the CSA's enforcement provisions are clear and explicit, the Court may not look beyond its plain terms to generate a new cause of action.   "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*,

---

[4] *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010) (affirming the district court's holding that "no private right of action exists under" the CSA); *see also Schneller v. Crozer Chester Med. Ctr.*, 387 Fed. App'x 289, 293 (3d Cir. 2010) (holding that there is no basis for civil liability arising under the Comprehensive Drug Abuse Prevention and Control Act, of which the CSA is a part); *United States v. 1840 Embarcadero*, 932 F. Supp. 2d 1064, 1072 (N.D. Cal. 2013) ("[C]ourts have consistently held that there is no private right of action under the CSA to force compliance."); *McCallister v. Purdue Pharma L.P.*, 164 F. Supp. 2d 783, 793 (S.D. W. Va. 2001) (rejecting a defense of preemption under the CSA for purposes of federal question jurisdiction because the CSA "establishes no Congressional intent to create a private right of action").

532 U.S. at 290; *see also Boswell v. Skywest Airlines, Inc*., 361 F.3d 1263, 1269–70 (10th Cir. 2004) ("[T]he choice as to which remedies are appropriate is for Congress rather than the courts. . . ."). This is particularly true here because the CSA, as a "criminal statute . . . enacted for the protection of the general public," is presumed not to include an implied right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 (1979); *see also Univ. of Colo. Hosp. Auth. v. Denver. Publ'g Co*., 340 F. Supp. 2d 1142, 1145 (D. Colo. 2004) (holding that the language in a provision of HIPAA "mirrors that customarily appearing in criminal statutes, and thus creates little reason to infer a private remedy").

**B.    The International Conventions are likewise not enforceable by private litigants.**

Plaintiffs cite the International Conventions, ECF #1, ¶¶ 41–51, and mostly unnamed bilateral international initiatives and trade agreements, ECF #1, ¶ 52, as support for their preemption claims.   Like the CSA, the International Conventions and other initiatives and agreements do not confer a private cause of action.  *See Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) ("[T]he background presumption is that '[i]nternational agreements, even those directly benefitting private persons, generally do not . . . provide for a private cause of action in domestic courts.'" (citation omitted)).   Additionally, these conventions, treaties, and agreements impose no duties on Colorado and confer no rights on Plaintiffs.  Instead, the United States is the signatory, and the United States Attorney General's Office has stated that the federal government's permissive approach to state regulation of marijuana (as outlined in the Cole Memo) "does not violate the United States' treaty obligations."  *Conflicts Between State and Federal Marijuana Laws: Hearing Before S. Comm. On the Judiciary*, 113th Cong. (Answers by James M. Cole to Questions for the Record at 4) (Sept. 10, 2013), available at http://tinyurl.com/povoazz.

**C.      Plaintiffs may not use the Supremacy Clause to graft a private right of action for preemption onto the CSA or the International Conventions.**

Plaintiffs imply that they may bring a cause of action for preemption directly under the Supremacy Clause. *See, e.g.,* ECF #1, ¶ 106.  The U.S. Supreme Court addressed precisely that argument just this term.  In *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), a group of plaintiffs sued a group of Idaho officials to enjoin enforcement of a state law that allegedly conflicted with the federal Medicaid Act.  The Supreme Court rejected their claim, holding that the Supremacy Clause is a "rule of decision" and "is not the 'source of any federal rights.'" *Id.* at 1383 (internal citations omitted).  The Court's ruling on the issue was categorical: to the Court, it is "apparent that the Supremacy Clause . . . *certainly does not create a cause of action*." *Id.* at 1383 (emphasis added).  The Tenth Circuit reached the same conclusion last year. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 822 (10th Cir. 2014) (holding that civil plaintiffs do "not have a private cause of action for injunctive relief under the Supremacy Clause").[5]  Thus, Plaintiffs have no independent, affirmative federal right under the Supremacy Clause to preempt Colorado's regulatory scheme for recreational marijuana.

---

[5] This does not mean the Supremacy Clause is entirely unavailable to private litigants.  It remains true that a civil or criminal defendant seeking to *avoid* state regulation may defensively raise the Supremacy Clause, both in an enforcement action and in a preemptive action to restrain enforcement. *Armstrong*, 135 S. Ct. at 1384 ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." (citing *Ex Parte Young*, 209 U.S. 123, 155–56 (1908))); *Planned Parenthood*, 747 F.3d at 829–830 ("[A] person likely to face [ ] an enforcement action may proceed in federal court to enjoin enforcement insofar as it is contrary to federal law").  But this case is far outside that paradigm.  Plaintiffs here seek to prevent Colorado from regulating *third parties*; they do not seek immunity from state liability.

**D.     Plaintiffs cannot invoke this Court's equitable powers to circumvent the CSA's exclusion of private enforcement.**

*Armstrong* also forecloses reliance on the federal courts' general equitable powers to create a cause of action for preemption.  "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Armstrong*, 135 S. Ct. at 1385 (internal quotation marks omitted); *see also Planned Parenthood of Kansas,* 747 F.3d at 817 (holding that "an injunction against [ ] state action" is available only if "the specifics of the federal statute" authorize that remedy).  Thus, a litigant "cannot, by invoking [the federal courts'] equitable powers, circumvent Congress's exclusion of private enforcement." *Armstrong*, 135 S. Ct. at 1385.

As explained above, the CSA does not create any private rights.  Enforcement of the Act is expressly delegated to the Attorney General of the United States, with criminal liability being the principal enforcement mechanism. *See Cannon,* 441 U.S. at 690.  And, like the Medicaid Act, the CSA was designed to be implemented through a system of centralized enforcement. *See* 21 U.S.C. § 878(a) (allowing state officials to enforce the CSA only with permission of the Attorney General); *cf. Armstrong*, 135 S. Ct. at 1386 (explaining that the Medicaid Act was designed to "achiev[e] 'the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decision making'" (internal citation and quotation marks omitted)).  Plaintiffs may disagree with the current centralized enforcement policies of the federal government[6]—just as the *Armstrong* plaintiffs disagreed with the federal

---

[6] The Department of Justice has implemented a policy of non-enforcement through the Cole Memo.  Congress, meanwhile, has endorsed this policy of non-enforcement to allow states to implement medical marijuana regulations that conflict with the CSA—even the commercial

government's enforcement of the Medicaid Act—but that disagreement does not grant them an affirmative right to preempt Colorado law.  And it is indisputable that this case, if successful, would directly undermine current federal enforcement policy as articulated in the Cole Memo.

Further, any doubt about the availability of equitable is resolved by the statute itself.  The CSA sets out a number of equitable remedies.  Most are granted exclusively to the federal government.  *See, e.g.*, 21 U.S.C. §§ 881, 882.  Other provisions allow States to participate in equitable relief, but these are carefully limited.  *See* 21 U.S.C. §§ 881(e)(1)(A), 881(e)(4), § 882(c).  And none of these equitable powers may be invoked by private litigants.  *See Jones v. Hobbs*, 745 F. Supp. 2d 886, 890 (E.D. Ark. 2010) ("To entertain under the auspices of the Declaratory Judgment Act, a cause of action brought by private parties seeking a declaration that the . . . CSA has been violated would, in effect, evade the intent of Congress not to create private rights of action . . . .").  Here, the Court would have to "disregard" the CSA's many "requirements and provisions," *Armstrong*, 135 S. Ct. at 1385, to hold that Plaintiffs can create a new remedy to preempt Colorado law simply by invoking the federal courts' equitable powers.

This same analysis applies to the International Conventions and other international agreements Plaintiffs implicate.  None of them creates a private right of action, and none indicates that Congress intended private litigants to enforce them by way of the courts' equitable powers.  Plaintiffs have no cause of action to preempt Colorado law.

---

medical marijuana regime that Colorado has implemented.  Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, tit. V, § 538, 128 Stat. 2130 (2014) ("None of the funds made available in this Act to the Department of Justice may be used . . . to prevent . . . States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.").

III.     **Amendment 64 is not preempted by the CSA or U.S. Foreign Policy conventions or agreements.**

Plaintiffs' Second Cause of Action alleges that Sections 3, 4 and 5 of Amendment 64 are preempted by the CSA and by "U.S. foreign policy".[7]  The federal preemption doctrine is rooted in the Supremacy Clause of the United States Constitution and embodies the fundamental Constitutional principle that "Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Federal preemption of state law on the same topic is not automatic, but occurs in one of four ways.  First, Congress may expressly preempt state law ("express preemption").  *Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 203 (1983).  Second, Congress may "occupy a field" by enacting comprehensive legislation that leaves no room for state regulation ("field preemption").  *Id.* at 204.  Next, "even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."  *Id.*  This "implied" or "conflict" preemption can occur either where compliance with both the state and federal laws is impossible ("impossibility preemption"), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ("obstacle preemption").  *Stilwell, Okl. v. Ozarks Rural Elec. Co-Op Corp.*, 79 F.3d 1038, 1043–44 (10th Cir. 1996).

Plaintiffs do not allege that any federal law or any aspect of the United States' foreign policy expressly or explicitly preempts any section of Amendment 64.  *See generally*, ECF #1.

---

[7] Unlike their explicit reference to the "International Conventions" in the First Cause of Action (ECF # 1, ¶¶ 104–06), Plaintiffs specify no particular treaty or policy that preempts Amendment 64, but instead refer to "U.S. foreign policy" generally.  *See* ECF #1, ¶¶ 107–08.

Plaintiffs likewise recognize that the CSA does not "occupy the field."  ECF #1, ¶ 34.  Instead, as

Plaintiffs note in ¶ 35 of their Complaint, the CSA contains a 'savings clause' under which

preemption occurs only if there is "a positive conflict between [a] provision of [the CSA] and [a]

State law so that the two cannot consistently stand together."  *Id*.  In the absence of express or

field preemption, Plaintiffs' second claim should be analyzed under the conflict preemption

doctrine.  *See, e.g., Wyeth v. Levine*, 555 U.S. 555, 581 (2009) (analyzing preemptive effect of a

savings clause similar to that in the CSA under impossibility and obstacle preemption where

plaintiff alleged that state law created a "direct and positive conflict" with a federal statute).

A.     **Amendment 64 should be analyzed for impossibility preemption, and under that analysis, it survives preemption.**

Given the CSA's categorical criminal prohibition and the International Conventions'

support for such categorical prohibitions, Amendment 64 cannot, as a matter of logic, create an

"obstacle" to either.  "Obstacle" preemption could properly apply to state laws governing *non*-

Schedule I drugs, because the CSA more comprehensively regulates them.  For these drugs, state

and federal law has the potential to overlap in complex ways that create conflicting affirmative

duties, thereby undermining the CSA's regulatory regime.  *Cf. Wyeth*, 555 U.S. at 580

(explaining that state law can "present[ ] an obstacle to the federal scheme" when a federal

agency weighs complex factors and strikes a balance among them to come up with

administrative regulations governing product safety (citing *Geier v. Am. Honda Motor Co.*, 529

U.S. 861, 883 (2000)). But unlike the laws and regulations governing non-Schedule I substances,

the federal law on marijuana is straightforward.  With only limited exceptions,[8] *all* marijuana-related conduct is illegal under the CSA.  *See Raich*, 545 U.S. at 24 (explaining that for non-Schedule I drugs, the CSA's "regulatory scheme is designed to foster the beneficial use of those medications, [and] to prevent their misuse," but for substances like marijuana, the CSA is designed only "to prohibit entirely the[ir] possession or use").

Marijuana-related activities remain unambiguously illegal under federal law no matter how Colorado chooses to regulate them at the state level.  As a result the risk of *federal* liability exists regardless of whether Colorado regulates marijuana, criminalizes it, or ignores it altogether.  At least two state courts agree that impossibility preemption is the appropriate analysis for state marijuana laws. *Crouse*, *supra,* 2013 COA at ¶ 25 ("[B]ased on the plain language of the CSA, we conclude that it cannot be used to preempt a state law under the obstacle preemption doctrine."); *Cnty. of San Diego v. San Diego NORML*, 81 Cal. Rptr. 3d 461, 480–81 (Cal. App. 4th Dist. 2008) ("[W]e interpret title 21 United States Code section 903 as preempting only those state laws that positively conflict with the CSA so that simultaneous compliance with both sets of laws is impossible.").[9]

---

[8] See Robert A. Mikos, *On the* Limits *of Supremacy: Medical Marijuana and the States' Overlooked Power to Legalize Federal Crime*, 62 VAND. L. REV. 1421, 1433 (2009) (describing two limited exceptions to the CSA's marijuana prohibition).

[9] Other state courts have applied both impossibility and obstacle preemption.  *See Ter Beek v. City of Wyoming*, 846 N.W.2d 531, 539 (Mich. 2014) (holding that a state medical marijuana law was not preempted because the state "immunity does not purport to alter the CSA's federal criminalization of marijuana, or to interfere with or undermine federal enforcement of that prohibition"); *Emerald Steel Fabricators, Inc. v. Bureau of Labor and Indus.*, 230 P.3d 518 (Or. 2010) (holding that states may legalize possession, use, and manufacture of marijuana but may not protect users from adverse employment actions); *Qualified Patients Assoc. v. City of Anaheim*, 115 Cal. Rptr. 3d 89, 108 (Cal. Ct. App. 2010) (no

Here, one may simultaneously comply with the CSA, the International Conventions (assuming they impose any duties on individuals, which they do not), and Colorado law by simply refraining from marijuana-related activities.[10]   Under an impossibility preemption analysis, Amendment 64 is not preempted by the CSA.

**B.   Even if Obstacle preemption applies, the CSA and the International Conventions do not preempt Amendment 64**

States maintain primary responsibility for protecting public safety by defining crimes and enforcing them.  *See Abbate v. United States*, 359 U.S. 187, 195 (1959) ("[T]he States under our federal system have the principal responsibility for defining and prosecuting crimes.").  Indeed, the federal government lacks resources to prosecute and punish every potential federal offense, especially marijuana crimes.  Federal arrests make up a tiny fraction—less than 1%—of marijuana-related arrests. Chemerinsky, et al., *supra* note 10, 62 UCLA L. REV. at 84. "[T]he federal government does not have the resources to impose [criminal sanctions] frequently enough

---

obstacle preemption because it is "not a license to commandeer state or local resources to achieve federal objectives.").

[10] Where a federal law regulates commercial activity to a lesser degree than state law, a State cannot avoid preemption by asserting that individuals may comply with both laws by declining to engage in the commercial activity altogether.  *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2477 (2013) ("Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability.").  Here, however, the CSA prohibits, not regulates, marijuana-related activity.  In these circumstances, it is appropriate for states to retain traditional police power to regulate conduct while recognizing the priority of federal criminal law.  Chemerinsky, et al., *Cooperative Federalism and Marijuana Regulation*, 62 UCLA L. REV. 74, 112 (2015) ("If the state can remove all its marijuana prohibitions . . . despite the CSA's prohibition and despite the Supremacy Clause—and it clearly can—the state can certainly add some prohibitions back . . . without running afoul of the CSA.").

to make a meaningful impact on proscribed behavior." Mikos, *supra* note X, 62 VAND. L. REV. at 1464.

Given the States' primacy in protecting public health and safety, and the reality of limited federal resources, the question here is whether displacing state regulatory power over marijuana is more of an obstacle to the CSA's objectives than is state-level regulation that attempts to control the market for an "extraordinarily popular substance" whose demand "has thrived in the face of vigorous criminal enforcement efforts." *Raich*, 545 U.S. at 32.  A number of state courts have held that state marijuana regulatory regimes are not preempted under an obstacle preemption theory.  *See Ter Beek*, 846 N.W.2d at 539; *Qualified Patients Assoc.*, 115 Cal. Rptr. 3d at 108.[11]  For four reasons, these courts are correct that wholesale preemption of state marijuana regulations under an obstacle theory is inappropriate.

***First***, in assessing preemption, courts must consider the manner in which Congress chose to implement its policies.  *See Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716–19 (1985) (noting that the comprehensiveness of federal regulations does not necessarily indicate that "States and localities [a]re barred from identifying additional needs or imposing further requirements").  The CSA, while broad, is carefully drafted not to impose on State

---

[11] No state court has ever gone so far as to actually strike down an existing state marijuana regulatory regime as a whole.  *See Haumant v. Griffin*, 699 N.W.2d 774, 781 (Minn. App. 2005) ("In the event that appellant's proposed charter amendment directing the Minneapolis City Council to 'authorize, license, and regulate a reasonable number of medical marijuana distribution centers in the City of Minneapolis' were to pass, it would be, at least for now, in conflict with current federal law and would thus be 'without effect.'"); s*ee also Pack v. Superior Court*, 132 Cal. Rptr. 3d 633, 653 (Cal. App. 2d Dist. 2011) ("[S]tate and local laws which license the large-scale cultivation and manufacture of marijuana stand as an obstacle to federal enforcement efforts."), *appeal dismissed as moot*, 283 P.3d 1159 (Cal. 2012); *contra Qualified Patients Assoc.*, 115 Cal. Rptr. 3d at 108.

authority.  The CSA imposes no affirmative duties on the States; it requires only that the

Attorney General "cooperate with local, State, tribal and Federal agencies concerning traffic in

controlled substances."  21 U.S.C. § 873(a).  The CSA also does not require States to mirror

federal policy to avoid express preemption or to maintain eligibility for federal funds.  Indeed,

the States' role in CSA enforcement is affirmatively limited: state officials may enforce the CSA

only through specific statutory provisions or if given enforcement powers by the Attorney

General.  21 U.S.C. §§ 871, 878, 882(c).[12]

*Second*, a state's decision to regulate marijuana does not, and cannot, insulate marijuana-

related activity from the many negative consequences of federal law.  Aside from the possibility

of federal criminal and civil liability, those who engage in marijuana-related activity face the

following:  loss of public services,[13] loss of the right to own firearms,[14] potential loss of

---

[12] The CSA also expressly contemplates state involvement in controlled substances regulation by immunizing state officials from prosecution under the CSA if they are "lawfully engaged in the enforcement of *any* [state] law or municipal ordinance relating to controlled substances."  21 U.S.C. § 885(d) (emphasis added).

[13] *See* 21 U.S.C. § 862 (denial of federal benefits to drug traffickers and possessors); *id.* § 862(a) (denial of assistance and benefits for certain drug-related convictions).  This includes possible eviction and disqualification from federally-subsidized housing.  *See Assenberg v. Anacortes Housing Auth.*, No. C05-1836RSL, 2006 U.S. Dist. LEXIS 34002, at *14 (W.D. Wa. May 25, 2006) (holding that a public housing authority may terminate a tenant's rental for marijuana use under federal regulations, despite the tenant's alleged compliance with state medical marijuana laws); *see also* 42 U.S.C. § 13661; U.S. Dep't of Housing and Urban Dev., *Medical Marijuana Use in Public Housing and Housing Choice Voucher Programs* (Feb. 10, 2011).

[14] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Open Letter to All Federal Firearm Licensees (Sept. 21, 2011) ("[A]ny person who uses . . . marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use . . . is an unlawful user of . . . a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition."), *available at* http://tinyurl.com/ogtz9ew; *see also* 18 U.S.C. § 922(g)(3); 27 C.F.R. § 478.11.

employment and employment protections,[15] inability to claim or assert bankruptcy protection,[16] and possible loss of contractual rights.[17]

*Third*, on the other side of the same coin, the federal government's decision to criminalize marijuana-related activity does not preclude other forms of regulation.  Courts have long recognized that state and federal taxes on sales of marijuana are permissible despite the federal policy of prohibition.  *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 778 (1994) (holding that, "as a general matter, the unlawfulness of an activity does not prevent its taxation"); *Simpson v. Bouker*, 249 F.3d 1204, 1210–13 (10th Cir. 2001) (relying on *Kurth* in analyzing Kansas's stamp tax on marijuana and noting that the purpose of the tax is "raising revenue and a concern that the 'flourishing underground economy not operate on a tax-free basis'") (citation omitted).[18]  Indeed, distribution of marijuana under Amendment 64 is subject to *federal* income tax.  *See* 28 U.S.C. § 280E (prohibiting normally available deductions for expenses of businesses

---

[15] *See Washburn v. Columbia Forest Prods.*, 134 P.3d 161, 167–168 (Or. 2006) (Kistler, J., concurring) ("The fact that the state may choose to exempt medical marijuana users from the reach of the state criminal law does not mean that the state can affirmatively require employers to accommodate what federal law specifically prohibits."); *see also* 41 U.S.C. § 8102 (setting forth drug-free workplace requirements for Federal contractors).

[16] *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 805 (D. Colo. Bankr. 2012) ("[A] federal court cannot be asked to enforce the protections of the Bankruptcy Code in aid of a Debtor whose [marijuana-related] activities constitute a continuing federal crime.").

[17] *See Tracy v. USAA Cas. Ins. Co.*, Civ. No. 11-00487 LEK-KSC, 2012 U.S. Dist. LEXIS 35913, at *39 (D. Haw. Mar. 16, 2012) ("To require Defendant to pay insurance proceeds for the replacement of medical marijuana plants would be contrary to federal law and public policy . . . .").

[18] *See generally Greer v. Dep't of Treasury*, 377 N.W.2d 836 (Mich. 1985) (state general sales tax applied to illegal sales of marijuana); *State v. Durrant*, 769 P.2d, 1174, 1183 (Kan. 1989) (marijuana taxation case in which the court stated, "[w]hile some have questioned the propriety of a governmental entity imposing a tax upon an illegal act, the United States Supreme Court has held that a tax may be imposed on an activity that is wholly or partially unlawful under state or federal statutes") (citing *Marchetti v. United States*, 390 U.S. 39, 58 (1968))).

"in connection with the illegal sale of drugs"); *Californians Helping to Alleviate Medical Problems, Inc. v. Comm'r*, 128 T.C. 173 (2007) (holding that § 280E applied to a medical marijuana provider making sales under California's Compassionate Care Act).  And in order to pay these federal taxes, marijuana businesses must subject themselves to additional federal regulation, including obtaining a Tax Identification Number from the IRS.

*Finally*, preempting state efforts to regulate marijuana would violate the most basic assumption underlying the Supremacy Clause:  "that the historic police powers of the States [a]re not to be superseded."  *Inter Tribal Council of Ariz., Inc*., 133 S. Ct. at 2256 (internal quotation marks omitted).  "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."  *New York*, 505 U.S. at 162.  Under Plaintiffs' theory of preemption, however, Congress may indirectly commandeer the States by requiring them to criminalize marijuana-related activity to avoid forfeiting their traditional police powers to protect the health and welfare of their citizens.  *See Qualified Patients Assoc.*, 115 Cal. Rptr. 3d at 108 ("Preemption theory . . . is not a license to commandeer state or local resources to achieve federal objectives.").  Nothing in the CSA or the International Conventions suggests this draconian result is appropriate.

## IV.   The Complaint should be dismissed with prejudice.

The defects in Plaintiffs' Complaint cannot be cured by amendment, as the claims are flawed as a matter of law.  The Complaint must therefore be dismissed with prejudice.  *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1190–91 (10th Cir. 2014) ("dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." (quotation and citation omitted)).

**CONCLUSION**

For the reasons set forth above, Governor Hickenlooper respectfully requests that the

Court dismiss the Complaint with prejudice.

Respectfully submitted this 1st day of May, 2015.

CYNTHIA H. COFFMAN
Attorney General

s/ *William V. Allen*
FREDERICK R. YARGER*
Solicitor General
WILLIAM V. ALLEN*
Senior Assistant Attorney General
MATTHEW D. GROVE*
Assistant Solicitor General
*Attorneys for Defendant*

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado  80203
Telephone:  720-508-6000
FAX:  720-508-6041
E-Mail: fred.yarger@state.co.us
            will.allen@state.co.us
            matt.grove@state.co.us
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2015, I served a true and complete copy of the foregoing **Defendant's Motion to Dismiss Plaintiffs' Complaint Under Rules 12(b)(1) and 12(b)(6)** upon all counsel of record through the Court's electronic filing CM/ECF system.

Paul V. Kelly
John J. Commisso
Jackson Lewis PC
75 Park Plaza
Boston, MA 02116

Mark A. de Bernardo
Jackson Lewis PC
10701 Parkridge Blvd., Ste. 300
Reston, VA 20191

Peter F. Munger
Ashley Paige Fetyko
Jackson Lewis PC
950 17th Street, Ste. 2600
Denver, CO 80202

*/s/  William V. Allen*